And we will move on to our next case set for argument today, Max Royal v. Atieva, Case Number 23-16049. Max Royal v. Atieva, Case Number 23-16049. You may proceed. I would like to reserve four minutes, Your Honors. Sure. Thank you. Good morning. May it please the Court. My name is Jake Bisolinsk from the law firm Laubaton Keller Cicero on behalf of lead plaintiffs in this federal securities action. The district court erred in dismissing this case on materiality grounds. The core error in the district court's approach was substituting the court's own judgment as to what was reasonable for investors to believe and rely on for the existing empirical evidence that investors, reasonable investors, in fact relied on the misstatements at issue in this case. The district court also erred, as I'll explain later, in holding, even in the application of its own judgment, the pleadings to too high of a standard on the motion to dismiss stage. Not to divert you from the merits, because I know you're here to argue that, but we have a gatekeeping function with standing. Can you address, I mean, obviously the district court found that you had standing. Would you agree that the district court's decision would conflict with the Second Circuit's recent decision addressing this question? Yes, it would, Your Honor. But the district court's decision is fully consistent with other circuit case decisions on this exact same issue. So we cite the Sendant case, which also conflicts with the Second Circuit's position. And that was, what court was that? I believe it's the Third Circuit, Your Honor. Okay. Counsel, I have the same concern with regard to the district court's analysis on standing. As I read the Supreme Court's blue chip stamps decision, it's pretty clear that a securities fraud action must lie in the purchase or sale of a security. And other, I guess the Second Circuit's decisions in Menora and Birnbaum tie the false misrepresentation to the actual security that is purchased. And the problem I'm having is that your claim here dealt with misrepresentations concerning Lucid, but the stock actually acquired was in a different company, Churchill. So if you can help me with that, I'm all ears. Certainly, Your Honor. So that was exactly the question that the district court looked at in its decision. And the reasoning here is that the Birnbaum decision and blue chip are both focused on the fact that one must have purchased a security and cannot merely proceed as the holder of shares or someone who declined to purchase shares. That's as far as the blue chip decision goes. The factual context of that case was plaintiffs were alleging the company was forced to, by an agreement, offer shares to the public and intentionally dissuaded the public from buying those shares. And the court said, well, you don't have any purchase. You don't have standing. The separate question of what security you have to have purchased is, well, you have to have purchased the security you're suing about, right? But the question of is the fraud sufficiently connected to the security you purchased is a question that's answered by the in connection with requirement. And that clear language of the clear standard applied to the in connection with requirement in this circuit is for publicly disseminated statements, you've satisfied the in connection with requirement when the misstatements are material to investment in the security you purchased. So defendants have tried to construct this view that we're doing something odd here. But the standard in all cases when looking at the in connection with requirement is, is the misstatement material to the investment that you made? The separate question that blue chip addresses is a much simpler question that many courts have rejected as applying a sort of nexus requirement and merely holds that you have to have purchased some security. I'm happy to talk more about standing or I can move back to materiality. Well, I'm still struggling. It seems to me that the court, the Supreme Court has said that normally rumors with regard to potential mergers and acquisitions that neither company here publicly confirmed or denied is not material. And therefore, you've got to have something more in order to tie the misrepresentation to the purchase or sale of the security. So I don't think the Supreme Court has ever said anything like that. What the basic decision said was, and let me talk for a second about the facts of basic, because I really do think it's informative here. In basic, the defendant had denied that there had been any merger negotiations. And in reality, there had been some meetings and some telephone conversations. There is really no question that the denial that there had been any merger negotiations was false. And so the question was, was that a material false statement? And to answer that question, what the Supreme Court said was, first of all, no bright line rules are allowed. The case was allowed to proceed. They found that the case could not be rejected on materiality grounds. But specifically what it said was, we'll look to the indicia of interest underlying those negotiations. We'll see in this case where the question was, were the negotiations themselves material? In that case, you have to look to whether or not the negotiations were far along and so on. That does not map onto this case where we're not dealing with false denials of a merger negotiation. And so the two lessons from basic that you should take away on this point is, one, no bright line rules, and two, a flexible standard that looks to what information reasonable investors actually relied upon. There's no requirement that anyone makes a public statement confirming the merger negotiations. And that sort of a rule would run afoul of the basic ideas of the securities rules, which is realistic in looking to the way that actual investors behave. But isn't the record here that the negotiations did not commence until after the article occurred or appeared publicly? Yeah, the record is that Bloomberg published an article on January 11th. And then for a couple of weeks after that, additional sort of pieces of information came into the public, additional news articles and so on. But immediately after that news article, negotiations did commence. And that's known to us now because of the proxy statement that was filed after the class period, right? Right. But neither company confirmed or denied the existence of negotiations publicly until the letter of intent had been signed. Is that correct? Yeah. So I was just answering the very specific question that you asked, which is the merger negotiations themselves had been going on for weeks at the time that the first false statement that we're alleging was made. The question that we think matters for this court to decide under a materiality analysis is, did reasonable investors rely on the misrepresentations at issue here? And there's sort of two approaches to answering that question. One is the position that we're advocating, which is that when you have very clear stock price reactions to those misrepresentations, that should carry the day. The real question that we're trying to answer is, at a time when it was not certain that this merger would go through, when there was a rumor in the market that was well-founded in the sense that reputable publications had talked about it, but it was still uncertain, did investors, in fact, rely upon misstatements about Lucid when buying CCIE shares? And you answer that question through a pleading stage inquiry that asks, is it so obvious that no reasonable person could disagree in holding that reasonable investors would not have relied on those misstatements? When we talk about the reasonable investor, though, wouldn't a reasonable investor know that all merger talks do not necessarily result in a final deal and that through the due diligence investigation that follows an indication of interest, mustn't we assume on this record that Churchill, the acquiring company, was at some point informed about the status of starter production and at that point made a choice, either terminate the merger and acquisition discussions or maybe it resulted in a lower purchase price. We have no way of knowing at this point. But why wouldn't an investor appreciate the fact that the acquiring company may also have learned of this information, maybe at the same time the investor did, but nonetheless decided to go forward with the acquisition while knowing that the starter production of this electric vehicle was going to be delayed significantly? I think there's two ideas sort of nested in that question. So the first idea is weren't investors aware that there was some uncertainty regarding whether or not the merger would go forward? Absolutely. We don't deny that at all. It was not a certainty that this merger would close. And that's not a question that's before this court. Well, it's clearly a speculative investment, is it not, for that reason? I would say that there is uncertainty embedded in this investment if you want to use the word speculative. How does uncertainty differ from speculation? I don't draw any distinction there. I don't either. What I was about to say is the courts are clear that the securities laws are designed to protect all investors. But the real point I'm trying to get to on this point is the degree of uncertainty involved is not like a gatekeeping question here. The question here is was it reasonable and did reasonable investors rely on the misstatements that Rawlinson made? And you don't have to have believed the merger was a certainty. You don't even have to have believed it was overwhelmingly likely to have bought CCIV shares based on a view that that was a good investment given the likely possibility that CCIV would acquire Lucid and given the misstatements that were being made about Lucid. And so our view is it doesn't depend on a view that this deal was certain to go forward. The other question you were asking is wasn't there a possibility that CCIV was informed of the truth? And that fact is unknown to us at this time. We don't know when CCIV learned the truth, but it's not terribly important to our— So it was being reported in the press, presumably. CCIV certainly knew that there were merger negotiations going on. No, no, no, the delays in the start of production. That was disclosed at the end of the class period when the truth came out. Whether or not CCIV was made aware of that during the diligence process has no bearing on whether or not investors were made aware of that when they were buying CCIV shares at a given price. And that loops back to the point we were just talking about, which is this isn't a fraud on CCIV. This is a fraud on investors who chose to buy CCIV shares at inflated prices. Well, why wouldn't it be a fraud on CCIV? There might also have been a fraud on CCIV. That's not the case that we're litigating. We're litigating a case on— Assumably CCIV was aware of what Mr. Rawlinson was saying that was being reported in the media. Yeah, I'm just saying I have—from our position, it's irrelevant to our case whether or not CCIV was also defrauded. I think that the narrative that we put forward into our complaint is that Rawlinson understood that he could affect CCIV's stock price by making public representations. While his company is privately traded, he goes on a stock market-centric TV show and talks about— and while the market believed this rumor, this merger was likely to emerge or had some degree of likelihood to emerge, he goes and makes misstatements about Lucid to drive up CCIV's stock price. And that gives him an upper hand in negotiating with CCIV because it would be very embarrassing for CCIV to walk away from a deal that it looked like investors were supportive of. I don't need to prove all of that for my case to move forward, but I wanted to give you the factual context. Counsel, Judge Gould, I have a question for you. Thank you. At some point, I think you mentioned reliance in your argument, but I had thought that the district court grounded its decision on materiality and didn't reach reliance. Yes, Your Honor. I wasn't trying to talk about—I don't remember what sentence you're referencing, but I wasn't trying to explicitly reference the reliance element. What I will say is in the American West case that, Your Honor, Judge Tallman, that you wrote the dissent in, you, I think, very elegantly explained that in fraud in the market cases, there's a very close connection between the notion that investors relied on misrepresentations and observable stock price changes and the issue of materiality. Our point here is very simple, ultimately, on this appeal. Investors, we cite in our briefing a lot of reasons why investors thought there was a good chance this merger would proceed. You don't even need to think about that, though, because you have very clear empirical evidence that, in fact, reasonable investors did think that the statements that Rawlinson was making were relevant to their investment in CCIV. If there are no further questions, I'll reserve the rest of my time. Thank you. Thank you. May I proceed? Yeah. May it please the Court, Brian Bernofsky on behalf of Appellees. Your Honors, the district court's judgment should be affirmed whether analyzed as a matter of materiality or under the issue of statutory standing under the purchaser-seller rule. Plaintiffs who bought stock in CCIV cannot sue Lucid or its CEO for allegedly misleading statements about Lucid's own business. So you agree that the district court erred on the standing determination? I do agree. And if it's okay with you. Can you address this Third Circuit case? Of course. I don't think I focused on it, but counsel said that there's already a circuit split out there between the Second and the Third. Do you agree with that assessment? I do not agree with that assessment. I don't believe my friend mentioned the case, but I believe he's referring to the Sendint case in the Third Circuit, which was cited in the papers. That case is looking at the issue of materiality. It did not address the purchaser-seller rule and blue-chip stamps, unlike the Second Circuit in Fruteram. And — Although it's interesting because there is some overlap here between the materiality analysis and the standing analysis. Yeah. I would say in this case, six of one, half-dozen of the other, because in a case like Sendint, there was at least a link between the two companies. There was an announced transaction. As Judge Tallman noted here, all you have here is rumors of a merger, or actually rumors of discussions about a merger. There was no announced transaction. Neither of the companies confirmed or denied or said anything about the merger until the merger was actually announced on February 22nd at the end of the classroom. So can you respond? Sorry, I know I keep bringing you back to standing because we have this gatekeeping fight. We can't even get into the merits until we get past this. And, I mean, is there anything wrong with a rule? Blue Chip, would you agree that Blue Chip doesn't directly require us to adopt a rule that says you have to purchase that stock, and if you didn't, you don't have standing? I guess what I would say, Judge Nelson, is that the factual scenario in Blue Chip did not address that issue. Right. But the language of Blue Chip, the rule announced in Blue Chip, I think does go further than that. And so that's my question, because the language in the opinion, which, I mean, we'll hear from opposing counsel if he wants to address this in rebuttal, but the purchaser-seller rule limits standing to purchasers or sellers of the stock in question. That's a direct quote from Blue Chip. Does that make that dicta or from the Supreme Court because it isn't really necessary for the case there because there wasn't a purchaser of the stock in question there? I don't think so. I mean, I think, again, I think the Court was laying out a rule grounded in policy concerns, policy concerns about vexatious securities litigation and the costs of this kind of consideration, which I would note the Court recognized 50 years ago. It's only gotten worse since then. And issues around evidentiary concerns, around oral testimony, I think those concerns apply directly. And I think the language that the Court uses —  Yes. There is an implied right of action, but we need to construe it narrowly and things like that. Correct. I would say the Supreme Court in Blue Chip itself recognized those policy concerns. Obviously, in Fruiteram, the Second Circuit, again, recognized it in the context of this particular or in a context very similar to this case. And I think, you know, obviously between Blue Chip and the Second Circuit's decision in Fruiteram, the Supreme Court has reiterated those policy concerns and the concerns around expanding what is an implied right of action in Section 10b, not expanding the scope of defendants who can be sued by private plaintiffs in a Section 10b action. Counsel, I have a question for you. Yes, Judge Golden. We have a circuit rule that says we can consider a well-considered dicta of the Supreme Court. That's some precedent that whether or not what the Supreme Court said is technically a holding or if it's a dictum. I apologize, Judge Golden. If the question is, is there authority in this circuit for regarding the consideration of dicta by the Supreme Court, that's not something that was briefed by the parties, and I'm not aware. No, I'm just commenting that I think that is our rule. And so my question is whether or not the statement that Judge Nelson referred to in Blue Chip is a holding or a dictum, wouldn't our panel, I think our panel would be bound by it. And so I'm saying, does that, would you agree that that statement means that the securities Yes, Judge Golden. I do agree with that. And if I may, I just want to, because I think it's important and I'm, I suspect my friend may address this on rebuttal because the district court did. The language that Judge Nelson quoted in the opinion, the stock in question, the district court found that that could just as easily be the stock that the plaintiff purchased. It was affected by, there was a, the stock that was affected by the statement.  Here, I think the district court said, well, that could just as easily be the stock in CCIV, even though the misstatement was not about CCIV. I think that is not a fair reading of Blue Chip. Well, especially when, does it even matter whether it's a fair reading of Blue Chip? Because as I understand it, they've, the plaintiffs have specifically said there's no misstatements as to CCIV here. Correct. Correct. The only, plaintiff's theory, well, let me go back to, if I may, Basic and the materiality question for a second because as I think, Judge. I know. There's overlap. We get that in the, it's a very frustrating process. Indeed. But, but, you know, the materiality question in, in, in Basic is, as applied here, is would information, is it substantially likely that information about CCIV would significantly alter, significantly alter the total mix of information relevant to an information at issue is, is information about a wholly separate company? And, and the only, I think ordinarily, very clearly, the answer would be no. Information about a private company, that the private company makes, statements by a private company about the private company itself would not be material to another company. The only reason plaintiffs allege or claim, argue otherwise here is because of rumors of a potential merger. And I do want to address a couple of points that my friend made. Again, I think they're somewhat relevant to both points, but in the context of materiality, plaintiffs argue that the information here was clearly material because it moved the market, because stockholders actually traded on it. I don't think that's, I don't think that's consistent with Basic. I don't think that's consistent with controlling law in this circuit. As this Court has explained, materiality, unlike loss causation, for instance, concerns an objective and hypothetical inquiry, an ex ante inquiry, into what information would be substantially likely to significantly alter the total mix of information for a reasonable investor. And that's the Miller v. Thain International case, which wasn't cited in the papers, but it's 615 F. 3rd 1095. I think, as the district court noted, stockholders do sometimes trade on speculative information. That happens. And I think it's clear from this case. What's remarkable about the case is, as we talked about earlier, the Bloomberg article that was published on January 11th, 2021, announced that there were merger discussions ongoing, according to sources familiar with the matter. But as plaintiffs concede, that was false. It didn't happen at the time. And yet the stock moved over 30 percent that day. I think that's pretty clear that shareholders are, yes, they do trade on speculative information, but that doesn't make it, that doesn't make them a reasonable investor within the meaning of the securities laws for purposes of either materiality or statutory standing. Counsel, this may be a better question for your opponent, but I'm looking at language from Blue Chip Stamps, which is pretty strong, at 421 U.S., at 731, where it says, the court of appeals in this case, which was the Ninth Circuit, did not repudiate Birnbaum. Indeed, another panel of that court, in an opinion by Judge Ely, had but a short time earlier affirmed the rule of that case in a case in the Ninth Circuit called Mount Clement Industries. But in this case, a majority of the court of appeals found that the facts warranted an exception to the Birnbaum rule. For the reasons herein stated, we are of the opinion that Birnbaum was rightly decided and that it bars respondent from maintaining this suit under Rule 10b-5. That may very well be dicta, but it's pretty strong. I agree, Your Honor. It is pretty strong. And again, I think there's also language elsewhere throughout Blue Chip Stamp that I think makes clear that the rule stands for the proposition that shareholders who own stock in one company can't, don't have statutory standing for policy reasons to bring suit against another wholly independent company. Well, and I just want to be clear, not for policy reasons, but for statutory reasons. I mean, the statute, that's how the statute is interpreted, not to give standing. I mean, I think we've got to be careful about not imbuing policy. There are policy reasons that support the language, but at the end of the day, we're reading the statutory language. I think that's right, Judge Gensler. The point I'm trying to make is a point that the Supreme Court made in the Dobbit case, and it responds to a point that my friend made about the inconnection with language in the statute. The Supreme Court explained in Dobbit that the purchaser-seller rule in Blue Chip Stamps is actually not grounded in the inconnection with language of the statute. It's an interpretation of the statute. It's the scope. It's the permissible scope of a cause of action under Section 10b and Rule 10b-5 that, again, is grounded in the notion that that what is an implied right that is not So there's a connection for sure, Your Honor, but — I mean, coming back to the statutory language, if we're just going to — my understanding — maybe you could address this — is that Congress proposed amendments to actually broaden the statutory standing, and they were not able to — it was never able to pass. Is that accurate? And if so, how relevant is that to our inquiry here? I believe that's accurate, and I believe it's relevant because absent some express authorization from Congress that would permit suit in the situation we have here, where you buy stock in one company and you try to bring suit against another company and its CEO for statements made about that other company that are wholly unrelated to the company you bought stock in, I don't think you have a cause of action. The only heartburn I have with your conclusion is that, as I understand it, these — what is it, SPAG? I forget what the acronym is. SPAC. Thank you, Judge Golden. These financing entities exist solely for the purpose of raising capital to invest in something. So it's — Churchill was not like a typical ongoing concern that decided to acquire another company and make it a subdivision — or a division of the — of the company. I think that's right. Again, I don't think that impacts the statutory standing rule at all. I guess what I would say is, in materiality, it would impact to some degree the magnitude, for example. If you were looking at the merger itself, a SPAC merging with a private entity, that would probably be material, because the SPAC does — sorry, that would meet the magnitude threshold, because the SPAC doesn't have operations of its own. But the probability portion of it I don't think changes at all. Right? In blue chip — sorry, excuse me — in BASIC, what the Supreme Court was looking at, as my friend noted, was the materiality of the merger itself. And in looking at the materiality of the merger itself in the context of an allegedly false denial that merger negotiations were ongoing, the Supreme Court — what the Supreme Court said is you have to look at the probability of the merger happening and the magnitude of the merger in the context of the two companies. But even acknowledging that mergers are typically — have a high magnitude, right? Mergers are typically important events. Certainly it would be for a SPAC. Nothing in the Supreme Court's opinion suggested that probability didn't matter or some very, very low level of probability would be sufficient simply because a merger is an important event in the life of a company, even for a SPAC, Your Honor. Rather, what the Court said is you have to look to indicia of reliability at the highest corporate levels. I think what that suggests to me is — and I see I'm out of time. So — Go ahead and finish your answer. What that suggests to me, Your Honor, is that what you need is a reliable information. Whether the issue is the materiality of the merger itself or, as here, the materiality of one company's information to another where the only link between the companies is a merger, the probability of the merger is important, and that both in basic as well as the matrix decision, which we address in our papers. Thank you, Your Honors. Thank you. We'll hear rebuttal now. The most important thing I'd like to address is this idea of a bright-line rule of outstanding. So the position that the other side is advocating for and that the Second Circuit has adopted is a misreading of the blue-chip decision. Then why did the Supreme Court say what it said? Because what the Supreme Court was saying — it's very clear in context when you read the opinion that it was not suggesting any probing of the nexus between misstatements and the security that was purchased. The sole issue before the court was, do you need to have actually purchased the security that you're suing about? And in that context, the language that we're talking about I don't think is dicta. I think it's just a — But you didn't sue Churchill. You sued — And that's a question that turns on the nexus between the misstatements and the investment value of the security that they purchased, not a question about whether or not the misstatements were about the security that you purchased. So is your argument that even though Lucid was a private company that issued no public shares, that the publicly traded shares in Churchill serviced some kind of a proxy because it's being used to finance the acquisition of Lucid? That's a reasonable way of looking at it, but the thing that — it's not exactly what I'm trying to explain. What I'm trying to say is that there is a rule here that relates to the degree of connection between the security that you purchased and the misstatements. That is the in-connection-with requirement, and that's why the Sendamp case focused on the in-connection-with requirement, which turns on materiality. The question from Blue Chip is very, very narrow. It is merely, did you purchase a — I don't disagree with you about the question, but you heard two different portions of the language. I mean, I'll just repeat mine. Purchaser-seller rule limits standing to purchases or sellers of the stock in question. I guess you would adopt the same thing that this court did and said, well, in question could refer to either. And that's what courts have largely done, with the exception of the Second Circuit. The Sendamp decision addressed a merger in which they — But do you agree that the Sendamp didn't address the standing question specifically? I think Sendamp didn't address the standing question only because it's a made-up issue in this context. The question — there was a purchase, and so the standing requirement from Blue Chip was satisfied, and then it properly analyzed the question through the in-connection-with requirement. So there was no reason for it to discuss this in the context of Blue Chip. That's an invention after the fact. The only other sort of key point that I want to get to is, this is a case in large part at this stage that turns on the application of bright-line rules versus more factually intensive analysis. Our position is not that every time there's some theoretical merger between two companies, you're good to go to the races. The theory that we've put forward is, there's not a bright-line standing requirement here. There is a limit here on vexatious litigation that the defendants are so concerned about, and that limit is the materiality inquiry. The question is not some bright-line superficial rule about whether or not the statement named the issuer of the security you purchased, but it is — it turns on the reality of whether or not reasonable investors would have made investment decisions based on the misstatements that occurred. And here we have specific statements by the company that were extremely material to Lucid, stock price reactions to those statements in CCIV that largely answers that question, as well as the additional evidence we cite about why it was reasonable for investors to have made that decision. Okay. Counsel, thank you. Judge Gould, do you have any further questions? No further questions. Okay. Thank you to both counsel for your arguments. The case is now submitted. And that concludes our arguments for today. All rise.
judges: GOULD, TALLMAN, NELSON